Filed 2/27/15  P. v. Garcia CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B253778 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA093486) |
| v. | |
| ERIK GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard R. Romero, Judge.  Affirmed.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Erik Garcia of assault with a firearm (Pen. Code, § 245, subd. (a)(2);[1] count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), and two counts of criminal threats (§ 422, subd. (a); counts 3 & 4). As to count 1, the jury found that defendant personally used a firearm (§ 12022.5), and the jury found that each offense was committed for the benefit of a criminal street gang (§ 186.22, subds. (b)(1)(C) & (b)(1)(B)). Before trial, defendant pleaded no contest to possession of a controlled substance. (Health & Saf. Code, § 11377, subd. (a); count 5).

The trial court sentenced defendant to a total of 22 years and eight months in state prison, consisting of: in count 1, the middle term of three years, plus 10 years for the gang enhancement and four years for the gun enhancement; in count 2, a consecutive sentence of one year (one-third the middle term), with the gang enhancement stayed; in counts 3 and 4, a consecutive eight months for each (one-third the middle term), plus 20 months each for the gang enhancement (one-third the middle term); and in count 5, it imposed a concurrent two years.

On appeal, defendant contends that the gang enhancement findings were not supported by substantial evidence. We affirm.

## FACTS

### Prosecution Evidence

#### Testimony of Joseph Sanchez

Late on the night of September 23, 2012, Joseph Sanchez was riding his bicycle on Western Avenue in Torrance. As he rode past a gas station at Western Avenue and 227th Street, defendant yelled at him, asking him "where [he was] from." Sanchez believed that defendant was asking him what gang he was from, and he responded, "I don't bang," meaning he was not affiliated with a gang. Sanchez pedaled faster, trying to ride away, but defendant followed him in his car. Defendant drove with his car lights off, talking to Sanchez as he drove next to him. Sanchez turned onto side streets, hoping to lose

---

[1]     All further statutory references are to the Penal Code unless stated otherwise.

defendant, but defendant continued to follow him. Sanchez rode back onto Western Avenue and crossed over the center divider. Defendant then made a U-turn on Western Avenue, came up behind Sanchez, and clipped his rear tire, causing the tire to pop and Sanchez to fall on the ground.

Defendant got out of the car and said, "I'm gonna kill you," and "I'm gonna blow your brains all over this floor." Sanchez replied, "Take whatever you want," and offered his bicycle and watch. Defendant retorted, "I don't want your shit; I want your life." He said that Sanchez's father was a police officer and that Sanchez was a "rat" and had "ratted on" him. Defendant told Sanchez to lift up his shirt and asked him if he was "wired." He pulled a gun and held it up against Sanchez's chest. Defendant also called Sanchez a "stain" and said, "Fuck stains." After Sanchez insisted that defendant had "the wrong person," defendant put the gun away, got back in his car, and drove away.

Sanchez called 911 at about 12:30 a.m. on September 24, 2012, to report the incident. The recording of the call was played for the jury.

Testimony of Ricardo Gamero

At around 11:00 p.m. on September 23, 2012, Ricardo Gamero pulled into the gas station at 227th Street and Western Avenue. Gamero was there to pick up his friend Byron Solis, who parked his car at the gas station for the night. Gamero saw Solis "going back and forth" with defendant. Defendant kept asking Solis if he was a "snitch," "where he's from," and "what he doing there." Gamero understood the question "Where are you from" to be asking about gang affiliation. Gamero and Solis told defendant they did not know what he was talking about, and tried to communicate to him that they were not affiliated with a gang. Defendant told Gamero to drive away and leave Solis there alone with him. Defendant said that he had a gun in his trunk and would shoot Gamero, but Gamero refused to leave without Solis. Gamero told Solis to get in Gamero's car so they could leave. When Solis started running toward Gamero's car, defendant repeatedly told a person sitting in his car to "open the trunk." Solis got in Gamero's car. As Gamero drove away, he saw defendant standing by the open trunk.

3

Testimony of Byron Solis

Immediately after Solis had parked his car at the gas station, defendant came up to him, asked him where he was from, and called him a "snitch." When Solis got out of his car, defendant stayed in front of him, saying that he had a gun in his trunk. Gamero arrived, and defendant told Gamero to leave and said that he wanted to be alone with Solis. When Gamero refused to go by himself, defendant threatened Gamero by telling him he had a gun in the trunk and would kill him. Defendant told Solis he could not leave and said that he was going to jail in 10 days and "didn't really care" what he did. Solis ran to Gamero's car. As Gamero drove away, defendant ran to his car and popped the trunk.

Solis called 911 at approximately 11:20 on September 23, 2012, to report the incident, and again two hours later to follow up. Recordings of the calls were played for the jury. During the first call, when asked whether defendant "look[ed] like he would be a gang member," Solis responded, "Yeah. Oh yeah, definitely." When asked what "gang he may belong to," Solis replied, "Torrance."

Officer Gabriel Medina

Gabriel Medina, who testified as a gang expert, is a police officer with the Los Angeles Police Department, assigned to the gang enforcement unit of the Harbor Division. He monitors the "East Side Torrance" gang and the "Harbor City" gang.

The East Side Torrance gang claims a territory in the eastern part of Torrance. Members often wear the color blue. Primary activities of the gang include murder, attempted murder, carjacking, and assault with a deadly weapon.

Officer Medina testified that he was familiar with defendant due to an incident that occurred on September 1, 2012. On that day, Nick Granadino, a documented East Side Torrance member, was being chased by police and escaped by getting into a car driven by defendant, who drove away. Later that day, defendant was stopped while driving with Granadino still in his car. Defendant was dressed in baggy blue clothing. In addition, he had a tattoo of a female "joker." The "jokers" are an East Side Torrance "clique."

4

Officer Medina opined that Garcia was a member of the East Side Torrance gang. One basis for his opinion was that Garcia was stopped with a documented East Side Torrance gang member, whom he helped to flee. Granadino's standing in the gang was "pretty high up," and the fact that Garcia was dressed in all blue was "significant because he was out there promoting his membership and association with the gang." In addition, when interviewed by the police on September 1, 2012, defendant stated that he was familiar with many East Side Torrance gang members but had not been "jumped in yet." Officer Medina found defendant's use of the word "yet" important, understanding it to mean defendant expected to be initiated into the gang.

It was also significant that the crimes defendant committed on September 23, 2012, were in the territory claimed by East Side Torrance. Officer Medina stated "[G]ang members generally, when they commit this type of crime, like to operate in their areas. Adversely, if you're not a member of that gang, you're not allowed to engage in this type of behavior. For instance, when he approached Mr. Sanchez, he banged on him. What that means is he's challenging a rival gang member or suspected gang member. So what he did, he approached him and he asked him where he was from, and that's significant because it's very dangerous to do that. If you're gonna challenge somebody and ask them where they are from, if they are, in fact, a rival gang member, chances are they are going to be armed. So knowing that, if you're gonna do that, that means you yourself have to be armed." In addition, defendant called Sanchez a "stain," which is a derogatory term used by East Side Torrance gang members against Harbor City gang members. According to Officer Medina, use of the slur "stain" demonstrated defendant's "intimate knowledge" of the East Side Torrance gang's rival.

Officer Medina also opined that the crimes were committed by defendant for the benefit of, in association with, or at the direction of the East Side Torrance gang. According to Officer Medina, defendant engaged in "textbook gang behavior. When somebody is a newly minted member of the gang, they want to show that they're willing to commit crimes to promote the name of the gang in the area. By doing this, they create fear and intimidation in the community in which they claim as their hood, and that

5

promotes the strength and overall notoriety of the gang. It discourages people from reporting crimes and cooperating with law enforcement. And furthermore it enhances his reputation within the gang."

Under cross-examination, Officer Medina testified that defendant told him on September 1, 2012, that he had known Granadino since he was little and had been friends with him for a long time. Officer Medina also stated that he had not seen a joker tattoo on any other East Side Torrance gang members, and did not know the identity of any members of the jokers clique.

## Defense Evidence

### James Miller

James Miller testified that he was painting the Taco Loco restaurant on the night of September 23, 2012, when he saw defendant drive by and say "That looks like my brother's bike" upon seeing Sanchez. Miller said that after defendant parked his car to talk to Sanchez, Sanchez started yelling the name "Chris." Sanchez then began swinging a chain and hit defendant with it. Miller never saw anyone pull a gun.

Miller testified that he was homeless and living in the Taco Loco parking lot. About a week after the incident, Sanchez came by at 3:00 in the morning and gave him $220. Miller thought Sanchez did not want him to go to court.

### Alaska Padilla

Alaska Padilla was defendant's girlfriend and was with him on September 23, 2012. She knew that defendant's brother's bicycle had been stolen and she saw Sanchez riding a bicycle that looked like it. Defendant stopped the car near Sanchez and they asked him, "Oh, we were just wondering, where did you get your bike from?" Sanchez said "shit" and rode across the street. They followed him and asked about the bicycle again, and then defendant's cousin and sister walked up. Sanchez screamed out various names and he and defendant's sister started grappling over the bicycle. Sanchez threw the bike, causing defendant's sister to fall. After Sanchez pulled out a chain and started swinging it, hitting defendant, defendant told Sanchez to take the bicycle, and Sanchez rode away.

6

Following the incident, defendant and Padilla drove to the gas station to get gas. Defendant saw someone he knew from high school pull up and talked and laughed with him. Another man then pulled into the gas station. Defendant never threatened to shoot anyone or pull a gun, and he never told her to open the trunk.

Padilla testified that defendant did not carry a gun. He was not a gang member and did not hang out with them, though he had one friend who was a gang member. Padilla stated that defendant had a tattoo of "Harley Quinn," a character from Batman, that symbolized Padilla.

Maira Rosales

Maira Rosales is defendant's cousin. She testified that on the night of September 23, 2012, at about 10:00 p.m., she was walking from a party when she saw defendant's car. Defendant and Sanchez were arguing about a bicycle. Sanchez, who kept yelling the name "Chris," had a chain and tried to hit defendant with it. Defendant never pulled a gun and never called Sanchez a "snitch."

Cindy Garcia

Cindy Garcia is defendant's sister. She was coming from a birthday party when she saw her brother's car near the Taco Loco and saw defendant standing next to someone with a bicycle. When she walked up, Sanchez pulled a chain out and defendant told her to hold onto the bicycle. She and Sanchez had a tug-of-war with the bicycle, and Sanchez eventually threw the bicycle toward her, causing her to fall. Defendant picked up the bicycle, gave it to Sanchez, and told him to go home. Defendant did not pull a gun, threaten Sanchez, or call him a "snitch." Defendant is not involved in gangs.

Defendant

Defendant testified that on the night of September 23, 2012, he was going to a cousin's birthday party when he saw Sanchez riding a bicycle that looked just like his brother's. When defendant asked Sanchez where he got the bicycle, Sanchez said "shit," and rode across the street. Defendant made a U-turn, stopped his car, and asked Sanchez where he was coming from and what his name was. Defendant did not threaten Sanchez or call him a "snitch." After defendant's sister arrived, Sanchez threw her to the ground.

7

Sanchez then grabbed a chain wrapped around his bicycle and started swinging it. Sanchez said, "LR gang, fool," hit defendant on the shin with the chain, and yelled "Chris." Defendant pushed the bike at Sanchez and told him to leave.

Later that night, defendant drove to get gas. As he was leaving, another car pulled up and blocked the window to pay for gas. Defendant got out of his car and saw Solis, a person he knew from high school. He told Solis he could not park there, and defendant asked him how his girlfriend was. Then Gamero pulled in and said to defendant "what's up." Defendant did not know Gamero and Solis were friends, so he told Gamero to leave. Defendant turned around to get into his car and saw Solis hop in Gamero's car. Defendant never threatened anyone.

Defendant testified that he was not a gang member. He had known Granadino for three years and did not know he was a gang member when they first became friends. Defendant's tattoos depicted comic and video game characters and were not gang related. Defendant was previously arrested for possessing a gun, but, according to defendant, the gun belonged to his cousin.

**Rebuttal**

Police Officer Elliot Rubright, who was the investigating officer on the case, testified that he interviewed defendant after he was arrested. During that interview, defendant admitted that he called Sanchez a "snitch."

## DISCUSSION

On appeal, defendant argues that the jury's findings that defendant's offenses were gang related and committed with the specific intent to promote a gang were not supported by sufficient evidence.

Section 186.22, subdivision (b)(1) provides for a sentence enhancement when the defendant is convicted of a felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." The enhancement requires "both that the felony be gang related and that the defendant act with a specific intent to

8

promote, further, or assist the gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1139.)

We review a section 186.22 gang enhancement finding for substantial evidence. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484.) "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054; see also *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329, *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 (*Ochoa*) [applying substantial evidence test to contentions that gang enhancements were unsupported by the evidence].)

## I. Substantial evidence supports the conclusion the crimes were gang related

Section 186.22, subdivision (b)(1) does not apply when a crime is committed only for personal reasons; rather, the crime must be "gang related." (*People v. Gardeley* (1996) 14 Cal.4th 605, 622.)

Generally, where a gang enhancement is alleged, expert testimony concerning the culture, habits, and psychology of gangs—including the motivation for an individual member's actions—is permissible, and a jury may rely on such testimony in making a

finding on a gang allegation. (*People v. Ward* (2005) 36 Cal.4th 186, 210; *People v. Gardeley*, *supra*, 14 Cal.4th 605, 617.) However, a finding that an offense is subject to section 186.22, subdivision (b)(1), cannot be based on a gang expert's testimony alone. (*Ochoa*, *supra*, 179 Cal.App.4th 650, 657.) "[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang." (*People v. Martinez* (2004) 116 Cal.App.4th 753, 762.)

Defendant contends that Officer Medina's testimony provided the sole basis for the jury's findings that the offenses were gang related. Defendant cites to a number of cases in which gang enhancements were reversed because the findings were based on little more than the defendants' membership in gangs.

For example, in *People v. Rios* (2013) 222 Cal.App.4th 542, the defendant, a gang member, was found driving a stolen car, and a loaded gun was found under the passenger seat. At trial, a gang expert testified that the defendant's possession of a gun and a stolen car would promote, further, or assist conduct by gang members because it would enable the gang to commit further crimes. (*Id.* at pp. 573-574.) The appellate court found this evidence insufficient, noting that the gun held by the defendant was not used to intimidate anyone in the community, there was no evidence that a victim knew defendant was acting with a gang purpose, the defendant was not in his own gang territory or that of a rival gang, the defendant did not display his gang affiliation, and the victims of the car theft were not rival gang members. (*Ibid.*)

In *Ochoa*, *supra*, 179 Cal.App.4th 650, the defendant, acting alone, brandished a shotgun and pointed it at the victim, who was sitting in his mother's car at a fast food restaurant. The defendant told the victim to exit the vehicle and, when he did, the defendant got in the vehicle and drove away. A gang expert testified that the crimes were gang related, stating that carjacking is a signature crime of gangs in general and that the defendant's crimes would benefit his gang. (*Id.* at p. 662-663.) In reversing the gang enhancement, the appellate court wrote how the defendant "did not call out a gang name,

10

display gang sings, wear gang clothing, or engage in gang graffiti while committing" the offenses, there was no evidence the victim saw any of the defendant's gang tattoos, the crimes were not committed in the defendant's gang territory or a rival's, and there was no evidence the victim was a gang member or a rival. (*Id.* at p. 662.) The court noted, however, that substantial evidence would have supported the gang enhancement findings "if defendant had been shown, in some other manner, to have had a gang purpose in mind when he committed the latter offense, e.g., by shouting his gang name, throwing gang signs, or otherwise demonstrating that he was seeking to intimidate the brandishing victim on his gang's behalf." (*Id.* at p. 663, fn. 9.)

The appellate court in *In re Frank S.* (2006) 141 Cal.App.4th 1192 also dealt with a lack of evidence supporting a gang enhancement. The minor, who was stopped by police after running a red light on his bicycle, was found to be in possession of a concealed knife, a bindle of methamphetamine, and a red bandana. An expert testified that the minor's possession of the knife benefited gang members because "'it helps provide them protection should they be assaulted by rival gang members.'" (*Id.* at p. 1199.) The appellate court reversed the true finding on the gang enhancement, finding that no evidence was presented supporting the enhancement other than the expert's opinion on gangs in general and his conclusion that the crime was committed for the benefit of a gang. (*Ibid.*) The court observed: "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid.*)

These and other opinions cited by defendant stand for the proposition that a gang enhancement may not be based solely on an expert's opinion that a crime was committed for the benefit of, at the direction of, or in association with a criminal street gang. While expert opinion may support a true finding on a gang enhancement, the facts in the case must show more than a speculative connection between the defendant's offenses and gang activity.

In contrast to the opinions relied on by defendant, the instant case contains ample evidence that defendant's crimes were committed for the benefit of, at the direction of, or

11

in association with a criminal street gang. Defendant initiated the confrontations with Sanchez and Solis by asking them where they were from. Sanchez understood the question to be a gang challenge and answered, "I don't bang." Gamero likewise understood defendant to be inquiring of gang affiliation. Officer Medina testified that this challenge was an instance of defendant "bang[ing] on" a rival gang member or suspected gang member. Defendant also called Sanchez and Solis "snitches," behavior consistent with Officer Medina's testimony that gang members seek to discourage people from reporting crimes and cooperating with law enforcement. In addition, defendant called Sanchez a "stain" and said, "Fuck stains." Officer Medina testified that "stain" was a derogatory term used by East Side Torrance gang members against their rivals from the Harbor City gang. Thus, the jury could properly infer that when defendant accosted Sanchez, defendant thought that Sanchez was a rival gang member. (See *People v. Romero* (2006) 140 Cal.App.4th 15, 17-19 [perpetrator's suspicion that victims were rival gang members supported finding that offenses were gang related].)

Furthermore, the crimes were committed by defendant in the territory claimed by the East Side Torrance gang. Indeed, Solis told the 911 operator that he believed defendant was a "Torrance" gang member. And the offense committed against Sanchez, assault with a deadly weapon, was, according to Officer Medina, one of the East Side Torrance gang's primary activities.

Defendant's status as a "lone actor" in the crimes did not prevent the jury from finding the gang enhancement true, since the section 186.22, subdivision (b)(1) enhancement may be applied to a defendant acting alone. (*People v. Rios, supra,* 222 Cal.App.4th 542, 546.) Defendant also argues that there was insufficient evidence he was an East Side Torrance gang member. But section 186.22, subdivision (b) does not require that the defendant be a gang member. (See *In re Ramon T.* (1997) 57 Cal.App.4th 201, 206-207; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402.) In any event, there was substantial evidence that defendant was a member of the East Side Torrance gang. He was previously stopped with a high-level gang member while dressed in blue, the gang color. He stated to police officers that he had not been "jumped in yet," from which

12

one could infer that he was at some point initiated into the gang, especially when considering the crimes he was shown to commit in this matter.

In sum, defendant committed crimes of intimidation of the sort associated with East Side Torrance gang members in East Side Torrance gang territory. He called his victims "snitches" and called Sanchez a "stain." The totality of evidence supported the finding that defendant's offenses were gang related.

## II. The findings that defendant possessed specific intent were proper

Defendant's argument that the prosecution failed to establish that he acted with the "specific intent to promote, further, or assist in any criminal conduct by gang members" relies on essentially the same argument as defendant made with respect to the first prong of section 186.22, subdivision (b)(1). Defendant contends: "Officer Medina did what several cases have condemned; he simply told the jury what he believed about defendant's intent and stated how he thought the case should be decided, with almost no underlying factual basis for his opinion." We disagree.

"Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) Here, the jury could have properly inferred that by threatening, intimidating, and challenging victims in the East Side Torrance gang's territory, defendant intended to promote the reputation of the gang, create fear of the gang, and enable the gang to commit further crimes. Based on the evidence, the jury could have concluded that defendant acted with the specific intent to promote, further, or assist in criminal conduct by gang members.

Furthermore, Officer Medina did not testify in a manner that would compel reversal. His testimony was not like the testimony disapproved of in *People v. Killebrew* (2002) 103 Cal.App.4th 644, in which the expert declared that when one gang member in a car has a gun, every other gang member in the car knows of the gun and will constructively possess the gun. That testimony reached beyond the facts of the case and resolved the issue of constructive possession for the jury. Here, substantial evidence was presented apart from Officer Medina's testimony that supported the finding of specific

13

intent, and Officer Medina's opinions were grounded in the evidence presented in the case.

To the extent defendant believes that Officer Medina's testimony was improper, defendant's failure to object at trial forfeited the challenge on appeal. (*People v. Panah* (2005) 35 Cal.4th 395, 476; *People v. Bailey* (1991) 1 Cal.App.4th 459, 463.) In any event, the jury was instructed, by CALCRIM No. 332, that it was not required to accept the expert's opinion as true or correct, and the opinion's meaning and importance were for the jury to decide. And, finally, contrary to defendant's assertion, Officer Medina did not testify about defendant's specific intent.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

14